**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**SARA E. LOPEZ-RIVERA,**          :

       **Plaintiff,**          :     **CIVIL ACTION NO. 3:12-2532**
                               **(JUDGE MANNION)**

          **v.**          :

**CAROLYN W. COLVIN,[1]**          :
**Acting Commissioner of**
**Social Security**          :

       **Defendant**          :

## MEMORANDUM

The record in this action has been reviewed pursuant to 42 U.S.C. §§405(g) to determine whether there is substantial evidence to support the Commissioner's decision denying the plaintiff's claim for Supplemental Security Income ("SSI") under the Social Security Act, ("Act"). 42 U.S.C. §§401-433.

## I.     PROCEDURAL HISTORY.

The plaintiff applied for SSI on April 23, 2009. (Tr. 23). In the

_____

[1] On February 14, 2013, Carolyn Colvin became acting Commission of Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil procedure, she has been substituted as the defendant.

application, she claimed disability starting on September 1, 2007. Her claim was initially denied on August 19, 2009 and the plaintiff filed a request for a hearing on August 26, 2009. (Id.). The Administrative Law Judge (ALJ) held a hearing on April 11 and August 3, 2011, taking testimony from the plaintiff and a vocational expert. After the hearing, the ALJ concluded the plaintiff could perform a range of sedentary work including jobs such as surveillance system monitor, semiconductor bonder, and as a stuffer. (Tr. 33-34). The ALJ then concluded the plaintiff was not disabled within the meaning of the Social Security Act. (Tr. 33). The Appeals Council denied the plaintiff's request for review, making the ALJ's decision final. See 42 U.S.C. §405(g).

At issue before this court is whether substantial evidence supports the Commissioner's decision that the plaintiff was not disabled because she was capable of performing a limited range of sedentary work prior to the date of the decision.

The plaintiff filed her brief in support of this appeal on June 4, 2013. (Doc. No. 9). The defendant filed a brief in opposition on July 3, 2013, (Doc. No. 10), and plaintiff did not file a reply brief. The case is now ripe for the

court's decision.

## II.    STANDARD OF REVIEW.

When reviewing the denial of disability benefits, the court must determine whether the denial is supported by substantial evidence. *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988)*; Johnson v. Commissioner of Social Sec.*, 529 F.3d 198, 200 (3d Cir. 2008). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552 (1988)*; Hartranft v. Apfel*, 181 F.3d 358, 360. (3d Cir. 1999)*, Johnson*, 529 F.3d at 200. It is less than a preponderance of the evidence, but more than a mere scintilla. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

To receive disability benefits, the plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. §432(d)(1)(A). Furthermore,

> [a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work. For purposes of the preceding sentence (with respect to any individual), 'work which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §423(d)(2)(A).


## III.   DISABILITY EVALUATION PROCESS.

A five-step evaluation process is used to determine if a person is eligible for disability benefits. See 20 C.F.R. §404.1520. See also *Plummer v. Apfel*, *186 F.3d 422, 428 (3d Cir. 1999)*. If the Commissioner finds that a plaintiff is disabled or not disabled at any point in the sequence, review does not proceed any further. See 20 C.F.R. §404.1520. The Commissioner must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether

the claimant's impairment prevents the claimant from doing past relevant work; and (5) whether the claimant's impairment prevents the claimant from doing any other work. See 20 C.F.R. §404.1520.

Here, the ALJ proceeded through each step of the sequential evaluation process and concluded that the plaintiff was not disabled within the meaning of the Act. (Tr. 25-34). At step one, the ALJ found that the plaintiff has not engaged in substantial gainful work activity at any time during the period from her application date of April 23, 2009 through the date of the decision. (Tr. 25). At step two, the ALJ concluded that the plaintiff's impairments (fibromyalgia, obesity, and schizoaffective disorder) were severe within the meaning of the Regulations. (Tr. 25). At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in Subpart P, Appendix 1. (20 C.F.R. §404.1520(d), §404.1520(d) and §416.920(d)). (Tr. 26).

The ALJ then found that the plaintiff has the residual functional capacity ("RFC") to perform a range of sedentary work. (Tr. 27-28). At step four, the ALJ found the plaintiff had no past relevant work as defined by 20 C.F.R. §416.965. (Tr. 32-33). At step five, the ALJ concluded that considering the plaintiff's residual functional capacity, age, education and work experience,

there were significant jobs in the national economy that the plaintiff could perform. (Tr. 33-34).

The ALJ therefore concluded that the plaintiff had not been under a disability, as defined in the Act, at any time from April 23, 2009, the date of application for SSI, through the date of the decision. 20 C.F.R. §§404.1520(g) and 216.920(g). (Tr. 34).

## IV.   BACKGROUND

The plaintiff was born on July 21, 1985, was 23 at the time she alleges her disability began, and was 26 at the time of the hearing in front of the ALJ. (Tr. 57). She completed high school through the tenth grade and speaks English. (Tr. 71). She resides with her fiancé, her fiancé's father, and her twin daughters, who were six years old at the time of the hearing. (Tr. 68). She lives on the second floor of an apartment building that requires her to walk up stairs on a daily basis. (Tr. 69).

In terms of her personal life, the plaintiff takes care of her own hygiene and dresses herself. She also wakes her daughters up in the morning and, with her fiancé driving, takes them to school. (Tr. 71-75). She spends most of the day on the social networking site Facebook where she communicates with

friends, family, and a fibromyalgia support group. She also watches television, looks through movies available on Netflix, and plays her PlayStation 3, a video game console. (Tr. 75-77). The video game console requires her to manipulate a game controller with her hands to play games. (Tr. 77). She routinely talks with family on the phone and through social media as well. (Tr. 79-80).

She does some of the cleaning in the apartment including dusting, dish washing, and cooking frozen meals in the oven or microwave. She reported that all of these activities occur while sitting down or standing for a short period of time. (Tr. 84, 94). She also goes grocery shopping approximately four times a month with those trips lasting approximately twenty minutes. While shopping she walks with a cart, but must lean on it in order to get around. (Tr. 95).

During her testimony, she noted that she had trouble with stress and depression. She claimed she had memory issues causing her to lose her job at McDonald's because she could not recall some of her job duties. She also detailed conflicts with a supervisor at another job. According to her testimony, the plaintiff could not stand for long because of the pain. She expressed a belief that her paranoia would prevent her from working at all because she

would be overwhelmed throughout the day. (Tr. 81-85).

She also noted that she often heard voices in her head, one male and one female, and they spoke to her on the day of the hearing. Generally, the voices tell her that people do not trust her and think she is lying. (Tr. 86). She also claimed she has delusions of killing people, including killing her fiancé. (Tr. 90).  Her most recent delusion occurred several months before her initial hearing.

Turning to her physical limitations, the plaintiff was first diagnosed with fibromyalgia in August 2008 by a rheumatologist. (Tr. 547-48). Specifically, the specialist concluded the symptoms were mild and would be alleviated through better sleeping habits, physical therapy, and muscle relaxants. The specialist further noted that there was no evidence of any other joint disease or dysfunction. (Id). The plaintiff went to three physical therapy sessions out of the 12-24 recommended, additionally she was a "no show" for one session and cancelled two others. (Tr. 554-55). She was discharged from physical therapy on February 6, 2008 due to non-compliance. (Id.). Dr. Heidi T. Kistler, M.D. noted on January 4, 2008 that the plaintiff's fibromyalgia was slightly improved. (Tr. 515). This visit occurred three days before her last physical therapy session on January 11, 2008. (Tr. 554).

She was treated by Center City Family Health between February 2009 and September 2010. (Tr. 664-674). She visited that office approximately once per month between February and June 2009, and then again between June and September 2010. (Id.). It is unclear from the record why the plaintiff has a one-year gap in her medical history from this office. Significantly, the plaintiff's musculoskeletal review showed a normal gait, range of motion, and no clubbing, cyanosis, or edema. (Tr. 639). She only noted fatigue and pain during her August and September 2010 visits. (Tr. 633, 666).

In the midst of her treatment with Center City Family Health, the plaintiff's records were reviewed by Dr. Gregory McCormack, M.D. on August 17, 2009. (Tr. 468). He diagnosed the plaintiff with obesity and fibromyalgia, but went on to note that she had significant physical abilities. She could frequently lift/carry 10 pounds and occasionally as much as 20 pounds. She could stand for 2 hours during a normal 8-hour workday and sit, with normal breaks, for a total of 6 hours. She could push or pull an unlimited amount of weight. (Tr. 470). Moreover, she could frequently balance, occasionally climb stairs/ramps, stoop, kneel, crouch, and crawl, but could never climb ladders or scaffolding. (Tr. 471). She had no issues with reaching or handling objects. (Tr. 472). Otherwise, the report contained no other restrictions, other than

9

limiting her from working with machinery. (Tr. 473).

After the plaintiff ended her treatment with Center City Family Health, Dr. Ralph B. Carruthers, M.D., became her treating physician on October 1, 2010. (Tr. 644). During her first visit, the plaintiff noted that her muscles hurt a lot and she was subsequently prescribed Vicodin on November 2, 2010. (Tr. 653). In the six months he treated the plaintiff, Dr. Carruthers saw her four times, but made few notes regarding his observations during each visit. (Tr. 653-54). His notes from those visits are extremely sparse, amounting to several hand-written words on each page. (Id.). Despite the lack of medical findings or treatment notations contained in Dr. Carruthers's record, the longest and clearest notation says the plaintiff "needs statement why re: can't work for one full year. Forward to Binder & Binder." (Tr. 654).

With those treatment notes and her other medical files available, Dr. Carruthers completed a multiple impairment questionnaire on March 8, 2011. He noted that she had muscle pain and some small joint pain at times. He further determined she was suffering from fatigue and numbness in her hands. She reported her pain was 8 on a scale of 10 and radiated from her lower back to her neck and shoulders. (Tr. 644-45). The pain was present all the time and was not relieved through medication. He opined she could sit

and stand for up to one hour during an eight-hour workday. Further, she could not sit continuously in a work setting. She would be required to move every 10-15 minutes for 15 minutes at a time. (Tr. 646).

She could frequently lift and carry up to 5 pounds and occasionally do the same with items up to 10 pounds. She had marked restrictions with grasping, turning, and twisting objects. She further was significantly limited in her ability to reach, handle, and lift objects. He did not recommend she stand or sit continuously while working. (Tr. 647). She could not work in a competitive work place and could not look at a computer screen for an extended period of time because of neck problems. (Tr. 648). She would also need unscheduled breaks of 15-30 minutes every 15 minutes during the workday. (Tr. 649). He finally opined she could never push, pull, kneel, bend, or stoop. (Tr. 650). In sum, he found her to be completely disabled. (Tr. 652).

Turning now to her psychological limitations, the plaintiff was treated by therapist Heather Miller, Patti S. Fisher, Psy.D., and Dr. Yury Yaroslavsky, M.D. of Community Services Group between January 2008 and May 2009. (Tr. 389 - 409). On her initial visit, the plaintiff complained of depression and suicidal ideation, but the notes indicate she was open, cooperative, and able to answer questions. (Tr. 393). The plaintiff was having some difficulties with

11

her attention, thought flow, and insight, but was otherwise oriented and participating. (Tr. 401). She was assigned a GAF score of 50.[2] Two weeks later, the plaintiff failed to show for an appointment and was discharged for failure to attend a psychiatric intake and evaluation. (Tr. 402).

She returned fifteen months later on March 27, 2009 and was evaluated by Dr. Yaroslavsky. (Tr. 406). She reported no suicidal thoughts or delusions. Moreover, she was appropriately dressed, well groomed, cooperative, pleasant, oriented, had intact memory, and made sufficient eye contact. She did report auditory hallucinations, but denied any type of other hallucinations. She was assigned a GAF of between 45-50. (Tr. 406-8). On April 10, 2009 she returned to Community Services Group and reported poor sleeping and eating habits. She also noted she was anxious with her whole body shaking at times. (Tr. 405). Two weeks later, on April 24, 2009, she reported her sleeping and eating had improved and she was "better," but was still hearing voices. Her eye contact, speech, and orientation were all normal. She reported no suicidal or homicidal ideation and no other hallucinations. (Tr.

─────────────────

[2]A G.A.F. score between 41-50 denotes "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders DSM-IV-R at 34 (4th ed. 2000).

404).

Her condition improved into May 2009 when her medication boosted her mood, thereby alleviating her depression. She was also becoming more organized with a positive and upbeat attitude. Despite these positive changes, she still felt anxious and had some difficulty focusing and remembering things. (Tr. 394). A later consultation that same month showed she was no longer hearing voices. She also reported being happy. All other psychological observations showed she was within normal limits, save for poor insight and judgment. (Tr. 403).

The plaintiff's psychological condition was reviewed by Dr. Richard W. Cohen, M.D., Dr. Phillip L. Taylor, Ph.D., and Dr. Raman Chahal, M.D. Dr. Chahal completed his evaluation on August 5, 2009. (Tr. 449). He found that she answered questions well and only had issues with recalling some dates. She reported driving, light housework, going out alone, shopping both online and in stores, adequate social interactions, reading to her children, and playing video games. She also said she had issues with memory, task completion, concentration, understanding instructions, and social interaction. (Tr. 449). He also discussed her recent improvements reflected in the notes by the medical personnel at Community Services Group. (Id.). Based on his

13

review, he diagnosed her with schizoaffective disorder. (Tr. 453). In making his diagnosis, he found that she had mild restrictions in daily living, no decompression, and moderate restrictions in social functioning and maintaining concentration, pace, and persistence. He determined they did not meet the 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 12.04B criteria for a determination of disabled. He further determined that she failed to meet the 12.04C criteria as well. (Tr. 460-61).

Dr. Chahal went on to complete a mental residual function capacity assessment and noted only the plaintiff was moderately limited in remembering and carrying out detailed instructions, interacting appropriately with the public, getting along with coworkers without behavior extremes, responding to a change in the work setting, completing a normal workday and workweek, and performing at a consistent pace without an unreasonable need for rest periods. (Tr. 465). He further made specific notes where he determined she could remember simple instructions, complete simple tasks during an eight-hour workday, maintain a regular schedule, interact properly with a small group of peers without distraction, accept routine supervisor oversight, and could present in a socially appropriate manner. (Tr. 466).

Dr. Taylor of the Bureau of Disability Determination conducted a review

14

of the plaintiff's mental condition on May 26, 2010. He conducted a Mini Mental Status test during his evaluation. He found the plaintiff was oriented to place and time, could name parts of the body, could repeat a simple phrase, identify three shapes, write and sign her name, and compose simple sentences. She performed poorly in some parts of the test, as she could only remember one out of three words and could not do serial sevens (counting down from 100 by intervals of seven). (Tr. 489).  He also found she could do simple math problems, but needed to use her fingers. (Id.). She reported poor social interactions, hearing voices, quick jumps to anger, and paranoia. (Id.). He concluded she was schizoaffective, bipolar type, mostly depressed, severe. She also suffered from impulse control disorder, post-traumatic stress disorder, and social anxiety. He further determined her psychosocial functioning to be fair. (Tr. 490).

He found her to be markedly impaired in terms of her interaction with the public, supervisors, and coworkers. He also determined her to be markedly impaired in her ability to respond to work pressures and changes in work routine. (Tr. 491). She faced moderate impairment with carrying out simple instructions, understanding and remembering detailed instructions, carrying out detailed instructions, and making work-related judgments. (Id.). He further

15

noted that she abused alcohol on a monthly basis, but this was not a major factor in her disability. (Tr. 492).

Finally Dr. Cohen provided a medical expert statement on behalf of the plaintiff.[3] He diagnosed her with schizoaffective disorder and personality disorder not otherwise specified. (Tr. 642). He found her to be depressed with auditory hallucinations and suicidal ideation. He opined the stress of work would further cause her to decompensate. She had moderate-to-marked impairment in daily living and marked impairment in social functioning, concentration, persistence, and pace. He concluded she would improve with treatment, but it would take two years to do so. (Tr. 642).

During the ALJ hearing, a vocational expert testified. The ALJ posed a hypothetical question that included pushing and pulling with upper extremities of objects to 10 pounds, occasional kneeling, stooping, crouching, climbing ramps and stairs, and crawling. (Tr. 116). He opined her work environment should be quiet without temperature extremes. Finally, he included a limitation that would require occasional interaction with supervisors and no real interaction with coworkers or the public. With those limitations, the

---

[3]The doctor's report is a single-page hand-written document that is extremely difficult to read. The court has relied the briefs in deciphering the doctor's handwriting.

vocational expert identified semiconductor bonder, stuffer, and surveillance system monitor as jobs the plaintiff could perform. (Tr. 118-19).

## V.    DISCUSSION

### A.    The ALJ properly evaluated the medical evidence of record

In her brief, the plaintiff challenges the ALJ's evaluation of both her mental limitations and her physical limitations stemming from her fibromyalgia. (Doc. No. 9). Specifically, she attacks the ALJ's decision to give little weight to the physical evaluation of her treating physician, Dr. Richard Carruthers, M.D. Moreover, she contends the ALJ did not properly evaluate the opinions of Dr. Philip Taylor, Ph.D. and Dr. Richard Cohen, M.D. regarding her mental condition. (Id.). The court will address each issue in turn.

The Court of Appeals for the Third Circuit set forth the standard for evaluating the opinion of a treating physician in the case of *Morales v. Apfel, 225 F.3d 310 (3d Cir. 2000)*. The Court stated:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." *Plummer* [v. *Apfel*, 186 F.3d 422, 429 (3d Cir.1999)] (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987)); see also *Adorno v. Shalala*, 40 F.3d 43, 47 (3d Cir.1994); *Jones*, 954 F.2d at 128; *Allen v. Bowen*, 881

F.2d 37, 40-41 (3d Cir.1989); *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Brewster*, 786 F.2d at 585. Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but "cannot reject evidence for no reason or for the wrong reason." *Plumme*r, 186 F.3d at 429 (citing *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir.1993)). The ALJ must consider the medical findings that support a treating physician's opinion that the claimant is disabled. See *Adorno*, 40 F.3d at 48. In choosing to reject the treating physician's assessment, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his or her own credibility judgments, speculation or lay opinion. *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir.1988); *Kent*, 710 F.2d at 115.

*Id.* at 317-318.

Similarly, the Social Security Regulations state that when the opinion of a treating physician is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record," it is to be given controlling weight. 20 C.F.R. §416.927(d)(2). When the opinion of a treating physician is not given controlling weight, the length of the treatment relationship and the frequency of examination must be considered. The Regulations state:

Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will

18

> give the source's opinion more weight than we would give it if it
> were from a non-treating source.

20 C.F.R. §416.927(d)(2)(I).

Additionally, the nature and extent of the treatment relationship is

considered. The Regulations state:

> Generally, the more knowledge a treating source has about your
> impairment(s) the more weight we will give to the source's medical
> opinion. We will look at the treatment the source has provided and
> at the kinds and extent of examinations and testing the source has
> performed or ordered from specialists and independent
> laboratories. For example, if your ophthalmologist notices that you
> have complained of neck pain during your eye examinations, we
> will consider his or her opinion with respect to your neck pain, but
> we will give it  less weight than that of another physician who has
> treated you for the neck pain. When the treating source has
> reasonable knowledge of your impairment(s), we will give the
> source's opinion more weight than we would give it if it were from
> a nontreating source.

20 C.F.R. §416.927(d)(2)(ii).

To qualified as disabled, the plaintiff must show that her fibromyalgia

creates symptoms and restrictions meeting the definitions noted in 20 C.F.R.

Part 404, Subpart P, Appendix 1, 1.02A, 1.02B, or 14.09D. Sections 1.02A and

B read in relevant part:

> Major dysfunction of a joint(s) (due to any cause): Characterized
> by gross anatomical deformity (e.g., subluxation, contracture, bony
> or fibrous ankylosis, instability) and chronic joint pain and stiffness
> with signs of limitation of motion or other abnormal motion of the
> affected joint(s), and findings on appropriate medically acceptable

imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

or

B. Involvement of one major peripheral joint in each upper extremity (i.e., shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively, as defined in 1.00B2c.

20 C.F.R. Part 404, Subpart P, Appendix 1, 1.02A and B. The relevant section of 14.09D requires the disability cause "various combinations of complications of one or more major peripheral joints or other joints, such as inflammation or deformity, extra-articular features, repeated manifestations, and constitutional symptoms or signs. Extra-articular impairments may also meet listings in other body systems." 20 C.F.R. Part 404, Subpart P, Appendix 1, 14.09D. As discussed below, the ALJ's evaluation of the medical evidence supports the determination that the plaintiff did not meet the requirements cited above.

The ALJ gave limited weight to Dr. Carruther's determinations as they were not supported by the objective medical evidence of record. (Tr. 29). The plaintiff mainly contests the ALJ's reliance on the plaintiff's normal range of motions and gait as of April 2009 as not reflective of the transient symptoms

of fibromyalgia. (Doc. No. 9; Tr. 29). She points the court to *Foley v. Barnhart*, 432 F.Supp.2d 465, 476 (M.D.Pa. 2005) where that court remanded a case for further findings because of "the nature of fibromyalgia and the chronology of the medical evidence of record" was insufficient to support the ALJ's determination. Specifically, that court found that "no timely medical evidence contradicts" the opinion of a treating physician who diagnosed the plaintiff over a year-long period of treatment. *Id.* at 478. Upon remand, the ALJ was required to identify "contradictory evidence which would allow him to attribute no significant weight to [the treating physician's] opinion without seeking clarification or additional evidence." *Id.* at 476.

Initially, the case at bar is distinguishable from *Foley* because the treating physician here evaluated the plaintiff for approximately six months when he made his disability determination. The treating doctor in *Foley* observed and treated the plaintiff well over one year. *Foley*, 432 F.Supp.2d at 477. The physician in *Foley* also explicitly noted a worsening condition over that period, where no such evidence exists here. *Id.* In fact, the record shows when the plaintiff was getting consistent medical treatment and therapy, her condition improved. Treatment notes from January 2008 indicate the plaintiff was improving after only three physical therapy sessions. (Tr. 515).

21

As the ALJ noted, the plaintiff's musculoskeletal review as of April 2009 showed a normal gait, range of motion, and no clubbing, cyanosis, or edima. (Tr. 639). The initial diagnosis went on further to state her condition would likely improve through physical therapy, better sleep, and medication. (Tr. 547-48). However, the plaintiff continually refused to attend physical therapy and was generally non-compliant with her medical treatment. (Tr. 554). The ALJ credited Dr. Carruther's assessment in so far as it limited her ability to be exposed to noise and temperature hazards, as well as heights. (Tr. 30). He rejected most of the physical limitations as unsupported by Dr. McCormack's assessment and the plaintiffs own report of her physical condition. (Id.).

The plaintiff reported in August 2009, about the same time she was evaluated by Dr. McCormack, that she did light chores, drives, goes out alone, shops, reads books to her daughters, and plays video games. (Tr. 449). Although Dr. Carruther's report limits her ability to manipulate objects with her hands, the plaintiff routinely plays video games that require her to grasp a controller and hit buttons and a joystick with her fingers and thumbs. (Tr. 77, 648). There is nothing in the record to indicate the plaintiff had such reaching, grasping, or manipulation problems. The plaintiff's statements to the ALJ indicated just the opposite. (Id.) Based on Dr. Carruther's sparse treating

22

notes, it is unclear how he came to this conclusion regarding those limitations. (Tr. 653-54). Dr. McCormack also found no evidence to support any manipulative restrictions. (Tr. 472). As such, the ALJ's determination regarding those limitations was supported by the record.

Aside from Dr. Carruther's disability evaluation, there is nothing in the medical records to support his conclusion regarding her sitting and standing limitations. The plaintiff's testimony confirms that she further "could be there on [the computer] all day just sitting there." (Tr. 76). Beyond sitting at the computer, the plaintiff sits while performing a myriad of other daily tasks including playing video games, (Tr. 77), watching television, (Tr. 76), household dusting and vacuuming, (Tr. 84), and cleaning the dishes. (Tr. 94). These reports are consistent with the opinion of Dr. McCormack, which the ALJ credited in part, but ultimately determined the plaintiff would only be allowed to perform sedentary work, not light work as Dr. McCormack recommended. (Tr. 30). This determination is consistent with the medical evidence from her initial diagnosis through the time of the hearing. Unlike in *Foley*, he does not note the plaintiff's condition as worsening or deteriorating. Therefore, the ALJ appropriately rejected his physical limitations when it came to her sitting and standing restrictions, adopting those supported by the

23

medical records, the plaintiff's statements, and Dr. McCormack's opinion. There was no error regarding his evaluation of the plaintiff's physical condition.

Next, the plaintiff challenges the ALJ's review of Dr. Taylor's and Dr. Cohen's evaluations of the plaintiff's mental condition. (Doc. No. 9). Turning first to Dr. Taylor's opinion, he noted the plaintiff could perform many tasks properly, including writing simple sentences, drawing, identifying shapes, and math problems. (Tr. 489). It is unclear from his report how he determined the plaintiff's social impairment save for her own representations. (Tr. 489-90). These finding contradict the plaintiff's report to Dr. Chahal that she shopped alone, drives herself, and claimed adequate social interaction. (Tr. 449). Further, although the plaintiff may have some limitations, she socializes through Facebook with friends and strangers, makes frequent telephone calls to relatives, and routinely goes out in public to shop. (Tr. 75, 79-80, 95). She further reports that in two previous jobs in the fast food field, she quit after conflicts with other employees and her boss. (Tr. 81-84). Noting these limitations, the ALJ properly accounted for them in the hypothetical question in requiring sparse interaction with the public, coworkers, and supervisors. (Tr. 27-28). Dr. Taylor further reviewed the treatment notes from Community Services Group, but does not discuss why his observations and conclusions

are markedly different from those treating doctors. (Tr. 488).

Turning to Dr. Cohen's single-page hand-written evaluation, the ALJ gave limited weight to his determinations as they were unsupported by the record. As discussed above, the plaintiff reported significant social interaction at various times. (Tr. 81, 449). Further, Dr. Cohen did not evaluate the plaintiff and, unlike Dr. Taylor and Chahal, did not provide any explanation for his conclusions. Where there is such a limited evaluation and lack of any sort of personal interaction with the plaintiff, the ALJ properly gave his report little weight.

In rejecting Dr. Taylor's and Dr. Cohen's opinions, the ALJ gave significant weight to Dr. Chahal's August 2009 evaluation. (Tr. 31). As discussed in detail above, the plaintiff reported some social and physical limitations, but the doctor determined her mental condition was not as severe as she claimed based on the record and other treatment notes. (Tr. 449). Dr. Chahal specifically cited the Community Services Group treatment notes that showed continual improvement between March and May 2009. (Tr. 394-406). During her treatment she stopped hearing voices, reported no suicidal thoughts, and improved to the point where most of her psychological functions were within normal limits. (Tr. 403-4). Even prior to this improvement, Dr.

25

Yaroslavsky noted the plaintiff was appropriately dressed, well groomed, cooperative, pleasant, oriented, had intact memory, and made sufficient eye contact. (Tr. 406-7). As Dr. Chahal's opinion was supported by the medical evidence of record, specifically the plaintiff's continual improvement during treatment and her own reports and testimony, the ALJ's determination was not made in error.

### B. The ALJ properly evaluated the credibility of the plaintiff

The plaintiff lastly contends that the ALJ improperly discredited her testimony about her mental and physical impairments. (Doc. No. 9).

"[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility.' *Walters v. Commissioner of Social Sec.,* 127 F.3d 525, 531 (6th Cir.1997); see also *Casias v. Secretary of Health & Human Servs.,* 933 F.2d 799, 801 (10th Cir.1991) ('We defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility.')." *Frazier v. Apfel,* 2000 WL 288246 (E.D. Pa. March 7, 2000). "The ALJ must indicate in his decision which evidence he has rejected and which he is relying on as the basis for his

finding." *Schaudeck v. Com. of Soc. Sec.*, 181 F. 3d 429, 433 (3d Cir. 1999). An ALJ may find testimony to be not credible, but he must "give great weight to a claimant's subjective testimony of the inability to perform even light or sedentary work when this testimony is supported by competent medical evidence." *Id.*

The plaintiff points to her testimony where she discussed her need to shift her weight and lay down to relieve her pain in arguing the ALJ erred. (Tr. 96). This is inconsistent with her prior testimony, given the same day, that she could perform several activities for an entire day while sitting, including being on her home computer. (Tr. 76). She also mentioned she sits while doing household chores without noting any limitation or need to take frequent breaks. (Tr. 84, 94). Although in September 2010 she reported a need for a cane to help her walk, (Tr. 666), she never mentioned any issues with sitting or standing in her treatment with Center City Family Health Center. Her most recent treatment notes from Dr. Carruther's note a prescription for Vicodin, but no supporting cause or diagnosis. (Tr. 654).

There is also significant evidence noted by the ALJ that shows the plaintiff was non-complaint and often did not seek continuous medical treatment. (Tr. 32). The plaintiff claims that she explained she could not afford

27

to continue some treatments. She directs the court to pages 108, 554-556, and 691 of the transcript in support of her position. (Doc. No. 9). Upon review of those specific pages and the remaining record, no evidence exists to substantiate any financial reasons for ignoring her medical needs. The ALJ properly noted that her break in treatment and lack of follow-up in her diet and exercise program in determining her credibility. (Tr. 32). The plaintiff has large gaps in her treatment history with Center City Family Health, (Tr. 635-636), Community Services Group, (Tr. 403, 406), and her physical therapy sessions. (Tr. 554-55). The plaintiff fails to account for these large gaps and why, when seeing improvement through her physical therapy and mental health treatment, she failed to follow-up on the doctor's order. In sum, the ALJ properly evaluated the plaintiff's credibility and testimony in light of the relevant medical evidence and her own unwillingness to continue or maintain steady treatment of her medical problems. As such, there was no error.

## VI. CONCLUSION

For the reasons stated above, the plaintiff's appeal from the decision of

the Commissioner of Social Security, (Doc. No. 1), is **DENIED**.


s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: January 22, 2014**
O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2012 MEMORANDA\12-2532-01.hhs.wpd